1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3  --------------------------------------X
                                         :
4  SAMAROO, et al.,                      :
                                         :  11-CV-3391 (HBP)
5                    Plaintiffs,         :
                                         :
6                 v.                     :
                                         :  500 Pearl Street
7  DELUXE DELIVERY SYSTEMS, INC.,        :  New York, New York
    et al.,                              :
8                                        :  December 9, 2013
                     Defendants.         :
9  --------------------------------------X

10

11        TRANSCRIPT OF CIVIL CAUSE FOR MOTIONS CONFERENCE
              BEFORE THE HONORABLE HENRY B. PITMAN
                 UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES:

    For the Plaintiffs:         LIZABETH SCHALET, ESQ.
14                              Lipman & Plesur, LLP
                                500 North Broadway
15                              Suite 105
                                Jericho, New York 11753
16

17  For the Defendants:         RICHARD SPITALERI, JR., ESQ.
                                Jasinski PC
18                              60 Park Place
                                8th Floor
19                              Newark, New Jersey 07102

20

21

    Court Transcriber:          SHARI RIEMER
22                              TypeWrite Word Processing Service
                                211 N. Milton Road
23                              Saratoga Springs, New York  12866

24

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

1                                                                              2

2

3                              I N D E X

4

WITNESSES:              DIRECT      CROSS       REDIRECT      RECROSS

5

Alpheus Calderon           5          12            15           16

6

Carlton Borris            18          21

7

8

EXHIBITS

9

Plaintiff's                            MARKED        RECEIVED

10

1    Declaration                         9

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE CLERK: <u>Samaroo v. Deluxe Delivery Systems</u>.

2          Counsel, please state your name for the record.

3          MS. SCHALET:  For plaintiffs, Lizabeth Schalet of

4     Lipman & Plesur.

5          MR. SPITALERI:  For defendants Deluxe Delivery

6     Systems, Yoindra Ramnarayan, Richard Spitaleri of Jasinski PC.

7          THE COURT: Good afternoon.  We are here as a follow

8     up to the conference that we had in late November and the

9     principle issue to be resolved today is plaintiff's contention

10    that defendant have engaged in conduct to interfere with the

11    settlement of this case.

12          Ms. Schalet, do you have witnesses you want to call

13    or what do you want to do?

14          MS. SCHALET: I do, Your Honor.

15          THE COURT: Okay.  All right.

16          MS. SCHALET: Okay.

17          MR. SPITALERI: Your Honor, I would just object to

18    this.  The scope of this hearing as I understood it was to

19    question the individuals who did not sign the settlement

20    agreement.

21          THE COURT: I don't know who the witnesses are yet.

22    I mean who are the witnesses?

23          MR. SPITALERI: The witnesses are individuals who

24    have signed the settlement agreement.

25          THE COURT: Who are the witnesses?  What are their

4

1  names?

2       MS. SCHALET: Their names are Alpheus Calderon.  He

3  is the plaintiff who signed the declaration that I handed up

4  last time, Your Honor.

5       THE COURT: The declaration you handed up last time

6  was unsigned.  There was -- you didn't hand me a signed

7  declaration.  It was an unsigned declaration.

8       MS. SCHALET: I do have a signed copy now.  I had

9  explained unfortunately I had left it in my office because it

10 was prepared that day and I ran out without it by mistake.

11 However --

12      THE COURT: The copy that's up here now is unsigned.

13      MS. SCHALET: Okay.  I'd like to give you the signed

14 one.

15      THE COURT: Mr. Jasinski has a copy?

16      MS. SCHALET: I will hand it to him as well.

17      MR. SPITALERI: I'm actually Mr. Spitaleri.

18      THE COURT: I'm sorry.

19      MR. SPITALERI: That's okay.

20      THE COURT: My apologies.

21      MR. SPITALERI: Thank you.  This is the first time

22 I'm seeing this.  I think this is also the first time anyone

23 from my firm has seen this document.  I'd just like to note

24 that.

25      THE COURT: Well, is this the same document that you

5

1  handed up the unsigned version of last time?

2          MS. SCHALET: It is.  It's the same one.

3          THE COURT: That copy was given -- it was Mr.

4  Jasinski the last time, was it not?

5          MR. SPITALERI: That's right, Your Honor, it was.

6  Yes.

7          THE COURT: Well, he got a copy of it the last time.

8  So your firm had a copy of it.  Let me just take a look at

9  this.

10                    [Pause in proceedings.]

11          THE COURT: The objection is overruled.  I'll hear

12  from Mr. Calderon.

13          MS. SCHALET: Okay.

14          THE COURT: Mr. Calderon.

15          MS. SCHALET: If you could take the stand.

16       Alpheus Calderon, Plaintiff's Witness, Sworn

17          THE CLERK: Please state your name and spell your

18  last name slowly for the record.

19          THE WITNESS: It is Alpheus Calderon, A-L-P-H-E-U-S,

20  C-A-L-D-E-R-O-N.

21          THE CLERK: Thank you.  Please be seated.

22          THE COURT: Ms. Schalet, go ahead.

23          MS. SCHALET: Thank you.

24                    DIRECT EXAMINATION

25  BY MS. SCHALET:

Calderon – Direct                                   6

1   Q.   Are you a driver for Deluxe Delivery Systems?

2   A.   Yes, ma'am.

3   Q.   How long have you been working for them?

4   A.   Approximately about four to five years.

5          THE COURT: Four to five -- how many, four to five

6   years?

7          THE WITNESS: Yes.

8   Q.   What do you do as a driver for Deluxe, very briefly?

9   A.   Well, I deliver food in the morning from the school, lab

10  school or any school they send me to from the morning from

11  approximately about nine to about twelve, 12:30.

12  Q.   What do you do after that?

13  A.   After that other jobs they give me to do.  Pick up from

14  the warehouse in the morning and deliver to various schools or

15  offices.  Then they call me in the afternoon to pick up other

16  stuff from [inaudible] or any of the odd jobs.

17  Q.   Were you present at the settlement conference in this

18  courtroom on July 11, 2013?

19  A.   Sure.

20  Q.   Did you understand that the case was settled?

21  A.   Yes, ma'am.

22  Q.   Did you continue work for Deluxe Delivery?

23  A.   Yes, ma'am, according to the agreement they made.

24  Q.   Who were your immediate supervisors at Deluxe?

25  A.   Roy and Tice and sometimes [inaudible] job there

                    Calderon – Direct                    7

1   [inaudible].

2           THE COURT: I'm sorry.  Who -- the names of your

3   immediate supervisors were what?

4           THE WITNESS: Roy Henry and Tice.

5           THE COURT: That was Tice Thompson?

6           THE WITNESS: Yes.

7           THE COURT: Go ahead.

8           MS. SCHALET: Thank you.

9   BY MS. SCHALET:

10  Q.    Did you have any conversations with either of them about

11  the settlement after July 11th when we were here in court

12  settling the case?

13  A.    No, ma'am.

14  Q.    Did you have a conversation with them before that?

15  A.    Before that about the case?

16  Q.    Let me back up.  Did you speak with Tice Thompson about

17  the settlement?

18  A.    No, I did not.  Tice only call me in after the settlement

19  to offer me some money to [inaudible].

20  Q.    Okay.  That's what I'm talking about.  What happened?

21  A.    Well, he called me in the back room and he tell me if I

22  take this amount of money and I sign it that money is going to

23  be -- don't sign the paper.

24  Q.    Did he offer you anything else?

25  A.    No.  That's it.  Just the funds.

                    Calderon - Direct                    8

1  Q.    How much did he offer you?

2  A.    He said three thousand bucks.

3  Q.    Do you remember approximately when this conversation was?

4  A.    It was -- it was in the afternoon when I came back to

5  Deluxe to pick up some school delivery.

6  Q.    Do you know the month?

7             THE COURT:  Do you have a date?

8             THE WITNESS: I can't quite remember dates you know.

9             THE COURT: A month?

10            THE WITNESS: I think it was July.

11            THE COURT: Was it before --

12            THE WITNESS: It was right after, right after the

13 settle -- I know it was right after the settlement, about a

14 week after the settlement.

15            THE COURT: Go ahead.

16 Q.    What did you tell him?

17 A.    I told him I'm going to think about it.  I will look into

18 it and think about it.

19 Q.    Did you have any conversations with defendant Ryan

20 Ramnarayan about the settlement?

21 A.    Yes, he approached me.

22 Q.    Where was that?

23 A.    It was in Lombardi, the warehouse also.

24 Q.    Do you recall approximately when this was?

25 A.    It was about -- it was when I -- I didn't sign the paper

Calderon - Direct                                    9

1   right there [inaudible] he asked me if I signed it I said no,

2   I didn't sign it so then that's when he offered.  He tell me

3   you sign it so he offered me -- he going to give me that

4   amount of money if I --

5   Q.   How much was that?

6   A.   He said about $3,000.00 and then he came back.  Next time

7   he saw me he said he's going to make it better.  He would give

8   me four.

9   Q.   What did you tell him?

10  A.   I told him I'm going to think about it.

11  Q.   Now, I'd like to show you a document.

12            MS. SCHALET: May I?

13            THE COURT: Why don't you show it to your adversary

14  first?

15            MS. SCHALET: Okay.

16            THE COURT: Is it marked?

17            MS. SCHALET: No, this is the same document that I

18  just handed up earlier to --

19            THE COURT: I understand but don't you want to have a

20  record that's clear?

21            MS. SCHALET: Can we mark this as Exhibit 1, please?

22                 (Plaintiff's Exhibit 1, Marked.)

23            THE COURT: Go ahead.

24  BY MS. SCHALET:

25  Q.   Could you take a look at that, please?  Can you turn to

Calderon - Direct                                    10

1   the last page?  Is that your signature?

2   A.   Yes, ma'am.

3   Q.   Can you tell me the circumstances of how this came about,

4   this declaration?

5   A.   Well, they call me to the office and the guy -- Roy and

6   Tice was there, I no longer can work at the company because I

7   sue the company and he said I can no longer work there.  So I

8   said okay -- I told them there was an agreement.  It's only

9   when the settlement is paid up then we can vacate the job when

10  they say --

11          THE COURT: They can what the job?

12          THE WITNESS: Vacate the job.

13          THE COURT: Vacate?

14          THE WITNESS: Yes, leave the job.  Leave the job.

15          THE COURT: Go ahead.

16          THE WITNESS: That's what I told them but they didn't

17  know [inaudible] see you.  So I told them okay, see you.

18  Q.   Then what happened?

19  A.   That's when I call you to get advice on what -- and tell

20  you what took place.

21  Q.   And --

22          THE COURT: I'm sorry, go ahead.  Go ahead.

23  Q.   Then did there come a time when you received this

24  declaration from our office?

25  A.   I didn't [inaudible].

Calderon – Direct                          11

1   Q.   I said did you -- did there come a time when you received

2   this declaration from our office?   That's the one [inaudible].

3   A.   Yes.

4   Q.   A copy of it?

5   A.   A copy of this?

6   Q.   Yes.

7   A.   Yeah.

8   Q.   How did you receive it?

9   A.   By fax.

10  Q.   Then what happened?

11  A.   That's when I signed this thing and fax it back to you.

12  Q.   So can you take a moment to review it?   Then I'm going to

13  ask you if it's accurate.

14                       [Pause in proceedings.]

15  A.   Yes, ma'am.

16  Q.   Is there anything missing from here?

17  A.   No.

18  Q.   Was there a time when Roy Henry called you and offered

19  you something?

20  A.   Well, yes.   Roy Henry called me before Tice spoke to me

21  and offered me a settlement over the phone at approximately

22  5:00 in the morning he called me on the phone.

23  Q.   What happened during that call?

24  A.   Well, I dismissed him.   I told him when I get to the

25  office I will approach him.

Calderon – Cross                        12

1   Q.    Okay.  Thank you.

2              THE COURT: Cross exam?

3                        CROSS-EXAMINATION

4   BY MR. SPITALERI:

5   Q.    Mr. Calderon, you stated that you signed this

6   certification correct?

7   A.    Sure.

8   Q.    Did you prepare the certification yourself?

9   A.    No, I said over the telephone I told him Ms. Schalet what

10  is the situation.

11  Q.    You didn't write this yourself?

12             THE COURT: First of all, let the witness finish

13  answering the question before you put another one.  Go ahead.

14  Do you want to finish your answer, Mr. Calderon?

15             THE WITNESS: Yes.

16  A.    So I told exactly what is the situation and she jot it

17  down or write it and fax me the copy.  I look over it and

18  that's what exactly what I told her over the telephone.

19  Q.    It's just a yes or no question.  You did not prepare this

20  document yourself; correct?  Did you prepare this document

21  yourself, yes or no?

22  A.    Well --

23             THE COURT: I think he explained what happened.  He

24  called his counsel.  He related the facts to counsel and

25  counsel prepared the affidavit, sent it to him and he signed

Calderon – Cross                           13

1   it.

2   BY MR. SPITALERI:

3   Q.   So you signed it on the same day you had the conversation

4   with Ms. Schalet?

5   A.   Yes, sir.

6   Q.   And that was also the same day you allegedly had a

7   conversation with Mr. Henry?

8   A.   Yes, the same day, yeah.

9   Q.   You stated under direct examination that when you

10  provided -- you provide independent contractor services to

11  Deluxe Delivery Services?

12  A.   Repeat yourself.

13  Q.   You provide independent contracting services for Deluxe

14  Delivery?  Do you do business --

15          THE COURT: It's not really relevant.

16          MR. SPITALERI: Your Honor, I believe it is relevant.

17  He testified in his direct examination as to when he picks up

18  lunches and I'd like to clarify that.

19          THE COURT: No, it's irrelevant.

20          MR. SPITALERI: He stated that he picks up lunches

21  for --

22          THE COURT: I've ruled.  Your motion for

23  reconsideration is denied.  Move on.

24  BY MR. SPITALERI:

25  Q.   You stated that you had a conversation with Tice in July.

Calderon - Cross                                    14

1   Is that correct?

2   A.   Yes, sure.

3   Q.   Did you inform your counsel of this conversation with Mr.

4   Thompson?  You referred to Mr. Tice Thompson; correct?

5   A.   Yes, sir.

6   Q.   Did you inform your counsel back in July of this

7   conversation you had with Mr. Thompson?

8   A.   I let her know -- aware from what the guy has been

9   saying.

10  Q.   I'm sorry.

11  A.   I let her know what the guy has been saying about

12  offering of the money.

13  Q.   Did you tell her this in July when the conversation

14  happened?

15  A.   Yeah.

16  Q.   You called Ms. Schalet in July and you told her of the

17  conversation with Mr. Thompson where he offered you money not

18  to sign the settlement agreement.  Is that what your testimony

19  is?

20  A.   Yes, I told her the guy talking about settle -- if we

21  give you certain amount of money if you will not sign the

22  paper.

23  Q.   Just so it's clear, you had this conversation with her in

24  July?

25  A.   Sure.

                    Calderon - Redirect                    15

1   Q.   Do you still do business with Deluxe Delivery Services?

2   A.   Yes, I work for them, yeah.

3   Q.   I'm sorry.

4   A.   Yes, I work for them, yeah.

5   Q.   Is your testimony that you still work for them?

6   A.   Yes, I work for them.

7   Q.   Is it your testimony --

8          THE COURT: He said yes, he stills work for them.

9          MR. SPITALERI: Okay.  I don't have anything further,

10  Your Honor.

11         THE COURT: Any redirect?

12                    REDIRECT EXAMINATION

13  BY MS. SCHALET:

14  Q.   Did you have any conversation with any of the other

15  drivers at Deluxe about whether or not they had been offered

16  any money?

17         MR. SPITALERI: Objection.

18         THE COURT: Sustained.  That's beyond the scope of

19  cross.

20         Mr. Calderon, I'm not -- there's something I don't

21  understand.  Maybe you can clarify it for me.  Were you or

22  were you not fired from Deluxe?

23         THE WITNESS: I was fired.

24         THE COURT: And they hired --

25         THE WITNESS: They call me back right after

Calderon – Recross                                16

1    [inaudible] Ms. Schalet in the afternoon.  That's when the

2    guys call me back and tell me come back and pick your route.

3            THE COURT: How long -- what was the interval between

4    -- let me phrase it differently.  How long were you out of

5    work for?

6            THE WITNESS: Well, the --

7            THE COURT: Did they hire you back the same day you

8    were fired?

9            THE WITNESS: The same day in the afternoon they call

10   me back about 4:00.

11           THE COURT: I see.

12           THE WITNESS: They call me back.

13           THE COURT: I see.  Did you lose any work?

14           THE WITNESS: Yeah, the whole say I was out of work.

15           THE COURT: So you lost one day of work?

16           THE WITNESS: Just one day, yeah.

17           THE COURT: Anything else based on my questioning,

18   Ms. Schalet?

19           MS. SCHALET: No.

20           THE COURT: Mr. Spitaleri, anything else based on my

21   questioning?

22           MR. SPITALERI: Yes.

23                        RECROSS EXAMINATION

24   BY MR. SPITALERI:

25   Q.   What was that day, November the 26th?

                    Calderon - Recross                    17

1   A.   It was -- it was last week, was it?  I think it was

2   November 26.

3   Q.   So it was --

4   A.   It was the day that she was come to court.  She was in

5   court that day.  She had to come to court when I call her.

6   She said she had to go to court.  She will address it.

7   Q.   Did you perform any work on that day?

8   A.   No.  They call me into the office early in the morning

9   and tell me I have -- the conversation and they tell me my

10  services are no longer needed.

11  Q.   They called you back that same day?

12  A.   They call me back that same day, yeah.

13           MR. SPITALERI: I have nothing further, Your Honor.

14           THE COURT: Thank you, Mr. Calderon.

15           THE WITNESS: Sure.

16           THE COURT: You're free to go.  Ms. Schalet, is there

17  another witness you want to call?

18           MS. SCHALET: I do, Your Honor.  I have Carlton

19  Borris.  He is another plaintiff and he has also signed a

20  declaration subsequent to our last conference and he isn't

21  somebody that I had disclosed prior but he has similar

22  testimony.

23           MR. SPITALERI: Your Honor, I would state the same

24  objection earlier and this time --

25           THE COURT: Same --

Borris – Direct                              18

1          MR. SPITALERI:  -- we've been ambushed.  We had

2    no -- we had no knowledge that this was going to happen today.

3    We didn't know Mr. Borris was going to be called as a witness.

4    It was our understanding based on the order that the only --

5    the scope of today's hearing was to talk to the non signers

6    and neither one of these gentlemen -- I'm sorry, both of these

7    gentlemen did sign the settlement agreement.

8          THE COURT: The objection is overruled.

9          THE CLERK: Please raise your right hand.

10          Carlton Borris, Plaintiff's Witness, Sworn

11          THE CLERK: Please state your full name and spell it

12    slowly for the record.

13          THE WITNESS: Carlton Borris, B-O-R-R-I-S.

14          THE COURT: Ms. Schalet, go ahead.

15          MR. SPITALERI: Thank you.

16                    DIRECT EXAMINATION

17    BY MS. SCHALET:

18    Q.   Hello.

19          MR. SPITALERI: Your Honor, I just object.  I haven't

20    even seen the document yet.

21          MR. SPITALERI: I haven't --

22          THE COURT: Why don't you show it?  Are you going to

23    show the documents to the witness?

24          MR. SPITALERI: I was actually not going to use the

25    document because --

Borris – Direct                                    19

1          THE COURT: Fine.

2          MS. SCHALET: I'm not going to use the document.

3          THE COURT: Go ahead.

4   BY MS. SCHALET:

5   Q.   So have you been employed by Deluxe Delivery Systems,

6   Inc.?

7   A.   Yes, ma'am.

8          MR. SPITALERI: Objection.  She's leading the

9   witness.

10         THE COURT: It's preliminary.  Go ahead.

11  Q.   When did you work there?

12  A.   For two years.

13  Q.   What's your position?

14  A.   I'm a driver, Deluxe Delivery driver.

15  Q.   Are you -- have you had conversations with Roy Henry

16  about the settlement of this case?

17  A.   Yes, ma'am.

18  Q.   Can you describe some of those conversations to the

19  court?

20  A.   Well, he used to call me -- all right.  Let me get it

21  clear.  Before the settlement or after?

22  Q.   Before.

23  A.   Before he used to call me like 5:00 in the morning and

24  told me if I can write a paper, write on the paper that I no

25  longer want any dealing with the case, notarize it and bring

Borris – Direct                                        20

1  it to him.  He told he's going to offer me $500.00.  I said

2  no, I'm not going to do it.

3  Q.   Did this happen more than once?

4  A.   Six, seven times.

5  Q.   Did you have any conversations with anyone else about the

6  settlement --

7  A.   No, he the only one.

8  Q.   -- prior to July 11th when the case settled?

9  A.   If I -- after the case settled?

10 Q.   Prior, before.

11 A.   No, he's the only one.  Roy is the only one.

12 Q.   Did you have any conversations with your co-workers?

13 A.   Yes, Anthony.  We talk, we just talk.

14 Q.   Tell me about those conversations.

15 A.   Anthony -- I was talking to him one time and he said I

16 have a [inaudible].

17         MR. SPITALERI: Objection.  This is hearsay.

18         THE COURT: Yes.  If you're offering it for the truth

19 of the matter asserted there then it's hearsay.

20         MS. SCHALET: It is hearsay.  Withdrawn.

21 Q.   Let's go to after the settlement was signed.  Were you at

22 the settlement conference here on July 8th?

23 A.   Yes, ma'am.

24 Q.   Was it your understanding the case was settled?

25 A.   Yes, ma'am.

Borris – Cross                                    21

1  Q.   Did you have any conversations with anyone about the

2  settlement after that time you appeared in court?

3  A.   No.

4  Q.   Now, did there come a time when you stopped working for

5  Deluxe?

6  A.   Yes.

7  Q.   When was that?

8  A.   Soon after I sign the agreement I was fired.

9  Q.   Who did you have a conversation with, if any, about --

10  A.   Roy Henry.

11  Q.   What was the conversation?

12  A.   I call him and I tell him that the school is reopen and

13  why I -- why am I not returning to work.  He said you sue the

14  company, I have no further business with you.

15  Q.   Thank you.

16            MS. SCHALET: Okay.  Thank you.

17            THE COURT: Cross.

18                        CROSS-EXAMINATION

19  BY MR. SPITALERI:

20  Q.   Mr. Borris, you testified earlier that you were a driver.

21  A.   Yes, sir.

22  Q.   Are you an independent contractor?

23  A.   Yes, sir.

24            MS. SCHALET: Objection.

25            THE COURT: Sustained.  The answer is stricken.  It's

Borris - Cross                                22

1   irrelevant.  I'm not sure -- you haven't laid a foundation

2   for -- to establish whether Mr. Borris knows what the

3   difference is between an independent contractor and an

4   employee.

5              MR. SPITALERI: I would like to do so, Your Honor.

6              THE COURT: It's irrelevant.

7              MR. SPITALERI: I think it is relevant because Ms.

8   Schalet asked questions about --

9              THE COURT: You made the same argument about ten

10  minutes ago.  I ruled.  You tell me why -- why is it relevant

11  to whether or not there's been misconduct in connection with

12  the settlement?

13             MR. SPITALERI: Because I think it goes to the

14  veracity of the witness.  I mean they're claiming --

15             THE COURT: Whether he's an independent contractor

16  goes to his veracity?

17             MR. SPITALERI: Yes.  Because they're filing tax

18  returns and they're reaping all the benefits of being an

19  independent contractor with the IRS and then they're turning

20  around and filing a wage and hour action.  I would say --

21             THE COURT: Do you want to offer a tax return?

22             MR. SPITALERI: I don't have them because they

23  haven't been produced in discovery yet.

24             THE COURT: So how do you know what's in the tax

25  returns?

Borris – Cross                          23

1          MR. SPITALERI: I would like to ask him that and lay

2     the foundation here.

3               THE COURT: No.  Overruled.

4          MR. SPITALERI: I think it goes to his credibility.

5               THE COURT: Well, you don't have the tax returns with

6     you.  So you don't know -- you can't impeach him with a prior

7     false statement under oath because you don't have the tax

8     returns.

9          MR. SPITALERI: But, Your Honor, respectfully, I'd

10    like to ask him what kind of tax returns he filed.

11              THE COURT: Overruled.

12    BY MR. SPITALERI:

13    Q.   You said that you didn't have any conversations with

14    anyone from Deluxe after the settlement.  Is that right?  Is

15    that your testimony?

16    A.   No, I have no -- no talk with no one.

17    Q.   So you didn't speak to anyone from Deluxe after the

18    settlement was signed?

19    A.   No.

20              THE COURT: About -- you didn't speak to anyone about

21    the settlement; is that right?

22              THE WITNESS: No, I didn't speak to anyone about

23    the -- just with Roy.  He called me and --

24              THE COURT: No.  After the settlement was signed I

25    presume you still spoke with Deluxe about your job, about

                    Borris – Cross                    24

1   getting assignments, doing work?

2          THE WITNESS: School had closed so I was home.   When

3   school close you be home for the two months.

4          THE COURT: I see.   Okay.

5          THE WITNESS: So [inaudible].

6          THE COURT: I see.   Go ahead.

7          THE WITNESS: I want to know what's going on.

8   BY MR. SPITALERI:

9   Q.   So when was the last time you performed services for

10  Deluxe?

11  A.   It was July the 27th was the last day.

12  Q.   July 27th was the last day you performed services.

13  A.   School closed for two months.

14  Q.   Then you testified that you didn't perform any work after

15  you signed the settlement agreement.

16  A.   No, no.

17  Q.   The settlement agreement was entered into in June.

18  A.   No, school was closed I told you.   When school was

19  closed.   So once school was closed I was home.   So all the

20  time when -- every summer when you home it -- you still work

21  but you don't work for the summertime.   You didn't work for

22  the summer but that's it, I didn't work for the summer.   In

23  September.

24  Q.   I'm sorry.   It seems to me you're saying two different

25  things.   You're saying you don't work in the summer but you've

25

1  also said that you worked in July.

2  A.   No, no.  July was the last date we work on school close

3  July -- school close August, September.  I didn't work.  We

4  don't usually work when school is closed.  I work with the

5  schools.  It's closed.  September school open we start to work

6  again.

7  Q.   So just to be clear.  You stated you didn't work at all

8  after the settlement, the parties entered into the settlement.

9  Is that right?

10  A.   Yes, I didn't work at all after that.

11  Q.   The parties entered in -- I'm telling you, representing

12  to you that the parties entered into the settlement in June.

13          THE COURT: No.  You ask questions on examination.

14  You can't testify.  If you want to show him a document you can

15  show him a document but --

16          MR. SPITALERI: I got it.  I have nothing further.

17          THE COURT: All right.  Any redirect?

18          MS. SCHALET: No, Your Honor.

19          THE COURT: Mr. Borris, did schools close at the end

20  of June or at the end of July?

21          THE WITNESS: The end of July.

22          THE COURT: The end of July?

23          THE WITNESS: Uh-huh.

24          THE COURT: Summer school?

25          THE WITNESS: The end is the last day and the school

26

1   closed.   That was it.

2             THE COURT: Okay.   You're excused.   Thank you.

3             Is there any other evidence you want to offer, Ms.

4   Schalet?

5             MS. SCHALET: No, Your Honor, not at this time.

6             THE COURT: I'm not sure -- given the testimony we

7   had today I'm not sure what your application is.

8             MS. SCHALET: Your Honor, I'd like to make a motion

9   to compel performance with the settlement agreement and based

10  on the testimony today and based on various cases I --

11            THE COURT: Well, you haven't -- last time you were

12  here I suggested to you that a memorandum of law and a formal

13  motion would really be helpful.

14            MS. SCHALET: Yes.   And, Your Honor, I'd like to

15  submit that.   I'm requesting permission to do that.

16            THE COURT: You don't need my permission to do it.

17  You can do it.

18            MS. SCHALET: Okay.   I'd like to do that.   I wanted

19  to wait until the --

20            THE COURT: Let me ask you something.   I'm sorry to

21  interrupt you.   One of the problems that we've had in this

22  case is my recollection is there are certain plaintiffs who

23  have refused to sign the release and the reason they have --

24  those plaintiffs -- am I correct that there are certain

25  plaintiffs who have refused to sign the release?

27

1          MS. SCHALET: Correct.

2          THE COURT: I'm not sure we have any evidence as to

3     the reason why those plaintiffs have refused to sign the

4     release, do we?

5          MS. SCHALET: Not as those plaintiffs.

6          THE COURT: Well, if we don't have -- if we have

7     plaintiffs who have refused to sign the release and the

8     release is one of the material terms of the settlement, has

9     there been full performance of the settlement from plaintiff's

10    side?

11         MS. SCHALET: No, but I think there's evidence that

12    the reason there can't be full performance is because

13    defendants have reached out to the plaintiffs after the

14    settlement, offered them a few thousand dollars --

15         THE COURT: What's the evidence that the plaintiffs

16    who have not signed the release have been influenced by the

17    defendants?

18         MS. SCHALET: The fact that they did it to two of the

19    other two current workers.

20         THE COURT: No, that's -- that's no evidence as to

21    the people -- as to the individuals who hadn't signed the

22    release and actually one -- I think Mr. Borris testified that

23    nobody contacted him after the settlement, that the

24    communications between the defendants and Mr. Borris were pre-

25    settlement.  So you have evidence that they reached out to --

28

1    the evidence if credited is that they reached out -- the

2    defendants reached out to Mr. Calderon after the settlement.

3              MS. SCHALET: That's correct.

4              THE COURT: So that's one out of -- what were there,

5    20 plaintiffs or something?

6              MS. SCHALET: 16.

7              THE COURT: 16.  So that's one out of 16.

8              MS. SCHALET: Well, that's one of the five current

9    plaintiffs.  The remainder of the plaintiffs are no longer

10   employed.

11             THE COURT: I mean there's no -- as far as the

12   individuals who haven't signed the releases go -- look, I'm

13   not trying to prejudge your motion but it seems to me there's

14   no evidence as to why they haven't signed the release or

15   there's no evidence of coercion or undue pressure by the

16   defendants with respect to those plaintiffs.

17             MS. SCHALET: Well, Your Honor --

18             THE COURT: And the question I still have then is

19   that if those plaintiffs haven't executed the release has

20   there been full performance by plaintiffs.  Go ahead.

21             MS. SCHALET: Well, Your Honor, I have two thoughts.

22   One is Mr. Borris had a number of conversations with the

23   plaintiffs that he's not able to testify to because they do

24   constitute hearsay.  So that unfortunately is not going to be

25   evidence that we have here.

29

1        The other thing is that they were supposed to come

2   today and --

3        THE COURT: That's a good --

4        MS. SCHALET:  -- tell us --

5        THE COURT: This is Mr. Clinton, Mr. Nwokiwu and Mr.

6   Rosal?  Have you been in touch with those individuals?

7        MS. SCHALET: I have not.

8        THE COURT: They're your clients and they're

9   unresponsive?

10        MS. SCHALET: One of them is arguably not my client

11   any more because he gave me a declaration saying that that I

12   submitted to the court during our last conference.

13        THE COURT: I don't recall that.  Maybe --

14        MS. SCHALET: He was the one who signed the

15   declaration stating that he didn't want anything to do with

16   the case any more and it was okay with him if it was dismissed

17   with prejudice.

18        THE COURT: Yes.  Now I remember who you're talking

19   about.  Well, do you want me to have the Marshals go out and

20   enforce the order?

21        MS. SCHALET: Yes.  I mean they should have come here

22   today.  I don't know why they didn't.

23        THE COURT: We can do that.  I'll wait for an order

24   to show cause as to the three of them as to why they shouldn't

25   be held in contempt and the Marshals will go out and serve it

30

1   personally.  That usually gets a witness' attention.

2             MS. SCHALET: Okay, Your Honor.  Thank you.  I'd like

3   to go off the record when we're able for a moment.

4             THE COURT: Let me -- so your applic -- your motion,

5   the motion you're going to make is to enforce the settlement?:

6             MS. SCHALET: Yes.

7             MR. SPITALERI: Your Honor --

8             MS. SCHALET: Or --

9             THE COURT: Let me finish and then I'll hear from

10  you.  Go ahead.

11            MS. SCHALET: Or to have these three severed and have

12  the settlement go forward for those that have already signed

13  and --

14            THE COURT: This is the discussion we've had before.

15  How -- the settlement was for all the plaintiffs.  I mean if

16  all the plaintiffs are not bound by the settlement the value

17  of the settlement from defendant's point of view is

18  substantially diminished, is it not?

19            MS. SCHALET: Well, it's unclear because the reason

20  they wanted to have all the plaintiffs sign it because they

21  didn't want anyone working for them who had been part of this

22  settlement.  Yet they have retained those three.  They

23  continue to work for them.  So the rationale for having all of

24  the plaintiffs no longer exist.  I think that's further

25  evidence that they're playing games here.

31

1          THE COURT: It would seem to me that part of the

2    value of the settlement from a defendant's point of view is

3    the defendants are buying peace.  They now that these

4    plaintiffs are not going to sue them -- are not going to sue

5    them for any claim that predates the date on which the

6    settlement was executed and if the settlement is not executed

7    on behalf of all the plaintiffs it seems to me the value of

8    the settlement is substantially diminished because the

9    defendants face the prospect of further litigation.

10          MS. SCHALET: I think the plaintiffs who haven't

11   signed it should be deemed to have failed to prosecute their

12   claims and their claims should be dismissed.  Whether it's

13   with prejudice or without I don't know but I haven't heard

14   from them for many months and part of my application that I

15   want to make is as to the two that I haven't heard from for

16   many months.  They have abandoned their claims.

17          THE COURT: Well, there was a case you cited to me

18   the last time before Judge -- there was a case before Judge

19   Gorenstein as I recall and in that case the claims were

20   dismissed without prejudice that substantially affects the

21   value of the settlement from defendant's point of view.

22          MS. SCHALET: Well, that would have to --

23          THE COURT: I'm still having a problem -- I think it

24   was -- was it Mr. Nwokiwu -- one of your plaintiffs you were

25   seeking to dismiss your own client's claims with prejudice

32

1   even though the client received no consideration.

2          MS. SCHALET: Well, that particular individual

3   submitted a declaration saying that he consented to dismissal

4   with prejudice that I pointed out a moment ago.

5          THE COURT: I understand but it's bizarre and I --

6   it's difficult to understand why a plaintiff would agree to

7   the dismissal of his own claim with prejudice if he doesn't

8   receive anything for it.

9          MS. SCHALET: He received something from the

10  defendants behind our back.  That's why.  They still have a

11  job.

12         THE COURT: Well, there's no evidence of that.

13         MR. SPITALERI: Your Honor --

14         MS. SCHALET: But that's our contention.  That's why.

15         MR. SPITALERI: This is just hearsay.

16         THE COURT: Well, virtually everything a lawyer says

17  is hearsay.  It's called argument.  It's not evidence.

18         MR. SPITALERI: Right.  But she's making up facts,

19  Your Honor.

20         MS. SCHALET: That's our assertion.

21         THE COURT: Mr. Spitaleri, what are your thoughts?

22         MR. SPITALERI: My thoughts are, Your Honor, I feel

23  like we sort of put the cart before the horse here.  She

24  hasn't made her application yet, yet we're having an

25  evidentiary hearing with regard to that application.  So we're

1   at a severe disadvantage.  So I would like to reserve --

2           THE COURT: Did you purchase a transcript of what

3   occurred the last time or did you speak with Mr. Jasinski

4   about what happened the last time?

5           MR. SPITALERI: Your Honor, I did not read the

6   transcript but I did speak to my colleague Mr. Jasinski.

7           THE COURT: Then you knew what was going to happen

8   today.

9           MR. SPITALERI: I would just reserve the right after

10  we see plaintiff's application to bring our own witnesses to

11  testify.  Your Honor, we completely agree with your assessment

12  of the settlement and we argued for total peace and unless she

13  can provide that we don't have a settlement here as far as

14  we're concerned.

15          THE COURT: If we have no settlement then we have a

16  case that's going to go to trial.

17          MR. SPITALERI: Yes.  And I think it's probably time

18  that we start proceeding in that direction and start

19  relitigating the case because I feel like we've been dealing

20  with this issue with regard to -- trying to revive the

21  settlement agreement and it's -- I don't think it's going to

22  happen.

23          THE COURT: Let me -- is it -- is it the defendant's

24  contention that they have not spoken to the plaintiffs

25  regarding the litigation after the settlement, after the July

1  settlement conference?

2        MR. SPITALERI: I was not aware of the specifics that

3  are laid out in this declaration.  It's my understanding

4  they've had conversations in the context of work and that some

5  of them may have been completely taken out of the context by

6  these individuals.

7        THE COURT: I'm not talking about conversations in

8  which plaintiffs are given work assignments, pick this up and

9  deliver it there.  I'm not talking about those conversations.

10 But have there been conversations between the defendants and

11 the plaintiffs after the settlement conference about resolving

12 the case outside the context of a litigation?

13       MR. SPITALERI: Very brief, Your Honor.  I've made an

14 offer to plaintiff's counsel and we've --

15       THE COURT: No, no.  I'm talking about between the

16 defendants themselves and the individual plaintiffs.  I'm not

17 talking about conversations between counsel.

18       MR. SPITALERI: I'm sorry.  I'm just not following

19 the question, Your Honor.

20       THE COURT: After the July settlement conference,

21 have your clients spoken to the plaintiffs themselves, not

22 counsel, but have your clients spoken to the plaintiffs about

23 resolving the matter outside of the settlement that was

24 reached in July?

25       MR. SPITALERI: My understanding, no.  They just had

35

1  candid conversations at work about work assignments and what

2  would happen if -- they may have been taken out of context.

3  That's my understanding of the facts.

4          THE COURT: What conversations do you believe may

5  have been taken out of context?

6          MR. SPITALERI: I don't know the specifics of them

7  and I'd have to speak to my client further about this.

8          MS. SCHALET: Your Honor --

9          THE COURT: Yes, go ahead.

10         MS. SCHALET: -- I think that the individuals who

11 were alleged to have engaged in these discussions should be

12 here in court.

13         THE COURT: Well --

14         MR. SPITALERI: Your Honor, I would object to that as

15 well.

16         THE COURT: The problem I'm having, Ms. Schalet, is

17 that the individuals -- there's no evidence as to the

18 individuals who have not signed the agreement and as to why

19 they haven't signed the agreement but we're going to have the

20 Marshals serve an order to show cause.  There will probably be

21 a date in early January.  I'll direct them to show up or show

22 cause why they shouldn't be held in contempt for ignoring the

23 order of November 26th.

24         When do you want to make your motion, Ms. Schalet?

25         MS. SCHALET: How is like January 5th?

36

1          THE COURT: All right.  After you get her motion, Mr.

2    Spitaleri, why don't you send me a letter and tell me when you

3    want to submit your opposition by.

4          MR. SPITALERI: Great, Your Honor.

5          THE COURT: I'll agree to any reasonable schedule.

6          MR. SPITALERI: It will be one of my colleagues.  I'm

7    actually leaving my firm on Friday.  So I won't be around.

8          THE COURT: Well, it's all the firm of Jasinski.

9    You're all one [inaudible] to me.

10         There's a case counsel -- there are limitations on

11   the conversations that counsel -- that the -- that defendant

12   can have with a class plaintiff or I think even a collective

13   plaintiff concerning a litigation.  There's a case from Judge

14   Schwartz that addresses this, a called Ralph Oldsmobile v.

15   General Motors Corp.  It was decided on September 7, 2001.

16   It's a 2001 Westlaw 1035132.  Once again it's Ralph Oldsmobile

17   v. General Motors Corp., 2001 Westlaw 1035132.

18         MS. SCHALET: Your Honor --

19         THE COURT: One second.

20              [Pause in proceedings.]

21         THE COURT: The general subject is also discussed in

22   a case by Judge Francis called Wu, W-U, against Pearson

23   Education, 2011 Westlaw 2314778.  I think that's probably

24   enough for now.

25         What did you want to say?

37

1           MS. SCHALET: Your Honor, I think that these

2    conversations that we alleged defendants have completely

3    frustrate the collective action procedures within the FLSA.

4    The whole reason there is a collective action is so that an

5    employer can't go around coercing people to accept a very

6    small amount of money and give up their claims.

7           I also think that this case is still a class action.

8           THE COURT: Well, the problem -- I don't think it's

9    ever been certified as a class action.  I looked at the docket

10   sheet today and there's no certification of it as a class

11   action.  So it's not a certified class action and the problem

12   with the first proposition you just articulated is there's

13   still no evidence of coercive conversations with respect to

14   the individuals who have not signed the settlement agreement.

15          MS. SCHALET: Your Honor, I would just --

16          THE COURT: Go ahead.

17          MS. SCHALET: The last thing I would point out is

18   that there is a lot of cases pursuant to Rule 23(d) regarding

19   how the court can manage a class action and all of those cases

20   apply to cases that have not have been certified where it's

21   putative class members who have been contacted.  So I do think

22   those cases are relevant.

23          THE COURT: Well, I look forward to reading about

24   them in your memorandum of law.

25          What did you want to say, Mr. Spitaleri?

38

1          MR. SPITALERI: It's really not that important.  I

2    just wanted to say that all this argument that Ms. Schalet is

3    making assumes that this is a class action which it's not even

4    close.  She hasn't even made a motion to conditionally certify

5    I don't believe at this stage and that usually comes --

6          THE COURT: Well, there are a number of plaintiffs

7    who have joined and I think it's -- my recollection is it's a

8    punitive class action.  It hasn't been certified yet because

9    we had the settlement conference that I thought had been

10   successful.

11         Let me ask you this.  If all the plaintiffs sign the

12   settlement agreement is defendant still on board with signing

13   it?

14         MR. SPITALERI: I believe so, Your Honor, yes.

15         THE COURT: They have to.  It's on the record.

16         I look forward to getting plaintiff's motion on

17   January 5th.  I'm going to issue an order to show cause to Mr.

18   Clinton, Mr. Nwokiwu and Mr. Rosal directing each to show

19   cause why they should not be held in contempt for failing to

20   respond to the order of November 26th.

21         Anything else, Ms. Schalet?

22         MS. SCHALET: Your Honor, may I make a motion for

23   conditional certification at the same time under 216(b)?

24         THE COURT: Sure.

25         MS. SCHALET: Thank you.

39

1          THE COURT: I'm not sure --

2          MR. SPITALERI: Let me --

3          THE COURT: One second.  One second.  Let me just --

4   I'm not sure where you're going, Ms. Schalet.  I'm getting

5   more confused by the minute.  Usually it's not a funny thing.

6   My recollection is that you had about 16 opt in plaintiffs

7   here.

8          MS. SCHALET: Yes.

9          THE COURT: And the settlement was with the 16 with

10  the opt in plaintiffs.

11         MS. SCHALET: Yes.

12         THE COURT:  My recollection is it did not settle as

13  a class.

14         MS. SCHALET: Correct.

15         THE COURT: What would be the purpose of a motion for

16  conditional certification?  If you get more plaintiffs opting

17  in presumably that's going to kill the settlement.

18         MS. SCHALET: I guess it would be in the alt --

19         THE COURT: Unless the settlement gets divided among

20  a greater number in which case the plaintiffs were currently

21  in the case each one would get a smaller amount.  I'm not sure

22  -- I'm not telling you you can't do it but I'm not sure I

23  understand why you want to move for -- seek conditional

24  certification and at the same time enforce the settlement.

25  They seem to be divergent paths.

40

1          MS. SCHALET: I would -- I think you're correct.

2          THE COURT: Is that what you want to do?

3          MS. SCHALET: I guess I want to think about it.  I

4     don't think I can ask for one in the alternative.  So I don't

5     think it works.  So I think yes.

6          THE COURT: Maybe the threshold question is to

7     determine whether or not the settlement is enforceable.  If

8     the settlement is enforceable it seems to me that conditional

9     certification would serve no purpose.

10         MS. SCHALET: Correct.

11         THE COURT: If the case -- if the settlement is dead

12    and the case is going to go forward then maybe conditional

13    certification makes sense but seeking to expand the pool of

14    plaintiffs while you're seeking to settle seems to be pulling

15    in opposite directions.

16         Did you want to say something off the record or

17    discuss something off the record, Ms. Schalet?

18         MS. SCHALET: Yes, I still think we should settle the

19    case.

20         THE COURT: Let's go off the record for a minute.

21                        [Off the record.]

22         THE COURT: As a result of the off the record

23    discussion I've asked Mr. Spitaleri to let me know by -- to

24    send me a fax by Thursday the 12th of December advising whether

25    or not his client is interested in further settlement

41

1  discussions before a mediator.  If both parties are interested

2  in further settlement discussions before a mediator I will

3  refer it to the mediation panel.  Unless both sides are

4  interested in further settlement discussions before a mediator

5  I don't think there's any point in referring it.

6           I'm going to issue an order to show cause to the

7  witnesses who were supposed to be here today but who didn't

8  appear.  That's Mr. Clinton, Mr. Nwokiwu and Mr. Rosal

9  directing each to show cause why they should not be held in

10 contempt for failing to appear today.  The defendant -- the

11 plaintiff is going to make her motion to enforcement the

12 judgment by January 5th.

13          If the case does go to mediation I will adjourn that

14 date but otherwise I'll expect the settlement -- the motion to

15 enforce the settlement by January 5th.

16          Anything else from the plaintiff's side?

17          MS. SCHALET: Thank you.

18          THE COURT: Anything else from defendant's side?

19          MR. SPITALERI: No, Your Honor.  Thank you.

20          THE COURT: Thank you all.

21                    * * * * *

22

23

24

25

42

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    _____

6                                            Shari Riemer

7   Dated:   January 9, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25